Case No. 18-5312, American Clinical Laboratory Association v. Alex Michael Azar, II, In His Official Capacity as Secretary of Health and Human Services Mr. Otero will be telephoned with the plan for the FOA. Good morning. Good morning, Your Honors. May it please the Court, Ashley Parrish for petitioner of the American Clinical Laboratory Association. I've reserved five minutes for rebuttal. In order to obtain an industry-wide benchmark of private market rates, Congress directed the Secretary to collect data from applicable laboratories and define specifically which laboratories would be required to analyze and then report the data. Instead of complying with that directive, the Secretary rewrote the statutory definition to exclude hospital laboratories, which are a large segment of the market, from the statutory requirements, and we are asking the Court to correct that statutory violation. What I'd like to do this morning is proceed in three steps. First, I think it might be helpful for the Court if I briefly explain the relevant statutory provisions and why there's a statutory violation. Second, address the issue of the jurisdictional bar and explain why it doesn't apply here. And third, explain why even if the jurisdictional bar did apply, this falls within the exception for ultraviarious action. Your Honors, as I said, I'd like to start by talking about the statutory requirements. There's a lot of complexity, but they can be simplified quite easily. Congress directed the agency to undertake two acts. The first act was to go out and collect from applicable laboratories, get the laboratories to analyze, collect, compile, and then report private market data. That's kind of the rub, isn't it, is what does applicable laboratory mean? Your Honor, that is exactly correct, because on the merits of the question... And you say it's clear from the statute what that means? Yes, Your Honor, I think it is. At least it's clear that it doesn't mean what the Secretary said, which is that Congress provided a specific definition of applicable laboratories. You can see that in Section A2 of the statute. It defines applicable laboratories to mean any laboratory that gets a majority of its Medicare revenues from two specific fee schedules. The reason why that definition is important, because the laboratories that do not get a majority or also get revenue from other fee schedules are hospital laboratories. So Congress was trying to come up with a definition that would capture a broad array of market participants, including the hospital laboratories. What the Secretary has now done in a redefinition, and in fact, it defines it as applicable lab as its definition of applicable laboratory. Instead of focusing on the laboratory and its revenues, what it does is it says that any applicable laboratory is any entity that has a specific billing number known as an NPI. And that specific billing number will encapsulate not just the laboratory itself, but any entity that's affiliated with it. In the case of hospital laboratories, Your Honor, what that does is it sweeps in all the Medicare revenues from the hospital as a whole. So the hospital is doing surgeries. It is doing radiology. It's doing oncology. All of those revenues are swept in. And so instead of looking at the revenues of the laboratory itself and seeing whether a majority come from these two schedules, essentially all hospital laboratories are exempted from the statutory requirement. Now, I know it's not before us, but the new rule would effectively look at the outreach services provided by a hospital-based laboratory as if that were a standalone laboratory in the community. Is that, in your view, the correct understanding of the statute? Or would it — would the correct reading of the statute require that laboratory services purchased as part of bundled services for inpatient or outpatient hospital patients have to be included? So, Your Honor, let me answer the first part of that question, and I may not quite get the last part of it. But in terms of — we haven't got to the point where they've actually implemented the new rule. And so I want to be careful, because I represent an association that has members with lots of different interests, not to go too far. But the thing about the new 14X approach is that that would be an approach that, in our view, is designed to get at the statutory requirement, which is to look at the revenues of the lab itself. So in that way, we think that it would address our concern here. Your Honor, I guess my point, and why I maybe lost you on the last part of the question, is that what we think Congress was intended to do — they wanted to take a look at these laboratories that didn't just provide services to the hospital and hospital patients, but was actually competing with the independent laboratories, the physician laboratories in the marketplace, by providing outreach services. And our point has always been that there are a number of different types of metrics — metrics that we proposed in our comments, metrics that have been adopted in the new rule, other ways of doing it — that would get at what Congress was focused on and not what the agency did. And what would the remedy be if we agreed with you that, notwithstanding the jurisdiction-stripping provision, we could review the rule, and if we did find it arbitrary and capricious, what would the remedy be? Well, Your Honor, let me — let me again clarify your question a little bit. Because we have — although we preserved an arbitrary and capricious argument, we are not making that argument. We are making a classic statutory excess jurisdiction violation. The reason why that's significant is because I think if you were to agree with us that the final rule is invalid, then all you would do is strike that down. But the consequences of that, I think, would get to a point that I'm sure the government will focus on, which is that will render the rates that they have put in place ultra-various, and it would allow any party that has complained about a payment so far to preserve their ability to seek some form of redress and require the Secretary to basically apply the data collection requirements that Congress required and have that reflected in the ultimate rates that are paid. Can I get that? Going forward, just to follow up on that, the rates that have already been paid, if you were contesting them, I guess my question is, are the only options the pre-PAMA rates or the rates that the Secretary has put in place under the challenge regulation, or is there some other option? So, Your Honor, because this is an unusual administrative scheme where all claims are channeled through an administrative process, what happens is any time that a claim is paid, meaning like a test is done and then goes for payment, there's an ability through an administrative process to dispute that and to preserve an ability to challenge it. This happens all the time. And then except in circumstances where there's tricky issues about budget neutrality which don't apply here, the agency is allowed to go back through that administrative process and make changes. So there would be lots of options if the court were to agree with us and strike down the rule for the agency to address this rule violation. It would have to do something through that administrative process in terms of either putting and collect the correct data and put the new schedule in place and apply it to the challenges that have already been made or to take a look at some other mechanism that would basically hold the market participants harmless as a result of the violation. I'm sorry, go ahead. My colleagues have questions. Let me ask you, why isn't the data collection that we're arguing over here part of the establishment of payment amounts, either under the Florida Health and Mercy Hospital line of cases such that it's inextricably intertwined, or just on the meaning of the word establishment itself? Yes. So, Your Honor, thank you. So that takes us to the jurisdictional bar. And I think where this case is quite distinct from other cases is that we have sort of three lines of arguments. First is that the text here not only shows that the statute is reasonably susceptible to a narrower construction, but we actually think the best reading of the statute is that Congress intended to review. Second, unlike in those other cases. Pause for a second. Let's deal with the meaning of the word establishment. Yes. Why isn't this part of the establishment of payment? You can't reach the payment amounts here without coming up with the data collection. So, Your Honor, establishment has potentially two definitions in this area. One is the act of establishing the payment amounts, which we argue under the statute is a separate act than the act of promulgating the final rule. The second interpretation, Your Honor, which is you're suggesting is the government suggested that establishing could mean any step in the process that leads to the ultimate rate. Well, how about the dictionary definition? To make or form, to bring about or into existence. You can't bring about the payments you're talking about here without the data collection system. So, Your Honor, with respect, that's not quite right. At the very least, it's inextricably intertwined. It is not, Your Honor. And let me explain why that's also the case. But I urge the Court that you start with the text because in the Florida health case and in the Mercy Hospital, the Court first finds that the text doesn't help them, that the act that the agency has done is covered by the bar, and then it applies inextricably intertwined to make sure that you can't carve anything out. It's always important to start with the text. And what's significant here is that there is a difference. When an agency promulgates a final rule that is directing which laboratories are to report data, it is not establishing payment amounts. It is taking a step that might ultimately lead to that. But there's no way in which you would say that that is actually an establishment of payment amounts. It's the only point of polling these applicable labs. The only reason they're doing it is to establish these market-mimicking rates. Yes, Your Honor. And the reason for that, though, is because of the extraordinary nature of what Congress was requiring here. And this gets to the point that I also want to make about that this is a regulation of primary conduct. This is not just asking for sort of discovery. This, as we set forth in the declarations that are attached to the complaint, this required the individual laboratories to take data, recompile it. A lot of it was in different systems. Take some of it off the papers. Mr. Parrish, the statute itself, subsection A, the heading of the statute, says reporting of private sector payment rates for establishment of Medicare payment rates. Your Honor, when I prepared here, I was reading cases to prepare for the presentation of argument, reading the cases for oral argument, that I was engaged in oral argument. That section that you just quoted that the government relies on proves why we are right. Congress set forth two distinct acts. The first act was to promulgate, after notice and comment, with different language, the parameters for data collection. And the second act, which is set forth in B, C, and D, which is to take whatever data results from that process and to establish payment amounts. The promulgation of the final rule itself was not an establishment of payment amounts, and Congress treated it differently. And one thing, I know I'm out of time, but we're getting close, but let me say is if you take a look at subsections A9, 10, and 11, that talks about civil monetary penalties, confidentiality of information, and regulations. Under the government's reading, as soon as you imposed a monetary penalty, that would be part of establishing a payment amount because it was under the same section, under the same heading, and it was connected with the ultimate goal of establishing payment amounts. And the argument you want to make, B, raise in a penalty, because the penalty proceedings get reviewed. There's a specific provision. And so if you had a client who just said, I'm not going to do this because it's not fair. It's an ultra-virus statutory scheme. I know I'm a clinical lab, but so is my competitor. So I'm not going to do this until you get it right. Could they raise that issue in the penalty? It's not clear to me whether they could raise it there or they're barred from raising it altogether. Under our view, they could raise it in either context. Under the government's view, they would be barred from doing that in the penalty proceeding. Well, if you can raise it in the penalty proceeding, then doesn't that hurt your argument here? Your Honor, I don't think so. It's not contempt or something. You have to get the penalty. Well, Your Honor, you'd have to read into the statute not a jurisdictional bar, but a channeling provision. And no one's argued that this is a channeling provision. And I think, Your Honor, if it helps to that, is to just take a look at the next section. It's not so much channeling in this context, but it's actually a penalty. Channeling is normally just a different procedure, but you don't have to get penalized first. But if the theory here is do it or, you know, don't do it, and then you can raise this if you want in defense of one of these proceedings, why wouldn't that be what Congress why wouldn't that as a matter of statutory construction be what Congress would have wanted? Well, I think if you look at the statute, there isn't the indication that they wanted to bar pre-enforcement reviews. I think the only argument is whether they intended to bar it altogether. And one of the reasons why I think that's true, Your Honor, is if you take a look at the next provision, which is the directive that talks about protecting confidential information, if the Secretary tomorrow were to say that he intended to disclose all this confidential information, we would argue that there is judicial review there. That would not be channeled through a penalty provision. It would just be it would be contrary to what the statute requires. One of the things that's Can you explain how these penalties work? It says up to $10,000 per day for each failure to report. Would that mean that each lab charge? It wasn't individual lab charge. I mean, I'm trying to figure out how draconian these penalties are, which might be a factor as well. We don't know, Your Honor, exactly because we complied. But our understanding is that it could be up to, and one of the declarations makes this point, potentially millions of dollars a day in penalties. Because it would be $10,000, not for I didn't report for this day, for each lab test I didn't report for this day, or arguably that's correct. Arguably that's correct. Yes, you're right, Your Honor. Did the Secretary take any position on what that means? Not in the briefing here, but didn't respond to our declarations on that point either. Has anybody been hit with penalties that you know of? Not that I know of, Your Honor. Mr. Parrish, on the hospital-based laboratories, when they receive bundled Medicare payments for inpatient or outpatient services, is there a per-service revenue for lab services that's identifiable or not? Well, Your Honor, they have to apply some form of counting mechanism to separate out what portion of the bundled payment is attributable to the lab versus not. So the 14X approach under the new rule is an attempt to do that. So it does pull out, because another way of understanding that, or as I initially understood it, perhaps misunderstood it, is that it's only seeking to count the lab outreach services as if there was an outreach lab at the hospital and an inward-looking lab, even though it's one unit, and to look only at the ratio of Medicare payments to the specified Medicare payments in the outreach lab. That's not your understanding of the 14X approach. Well, that's what we think should happen. As I understand the agency, the secretary said, look, it is too difficult for us to disaggregate these things, so we're just going to exempt the hospital labs on the assumption that... I understand that, but I'm trying to understand what you think the statute calls for and whether it would call for just putting aside what one might think of as the sort of hospital-facing lab services and only look at the lab and its outreach services as if that were a separate component. And whether that's what you're seeking, whether you think that's what they're doing or not. We think they need to compare. They need to take a look at the revenues from the lab, the hospital lab, that are attributable outreach services that are paid on these two schedules and compare it to the total revenues that the lab would receive. That requires some form of accounting mechanism, because the payments that the hospital receives, including the lab services, are all bundled together. So you have to account and disaggregate. Our point is that that isn't a throw-up-your-hands-it's-too-difficult. There are a number of ways that you can account for that. I see. So what one might think of as the hospital-facing lab services would go in the denominator, in your view. Exactly. As well as the outreach lab services. So some hospitals that provided primarily hospitals, some labs that provided primarily hospital services. Would not be counted. Would not be counted. But a bunch of them would because they provide a lot of outreach services. Those are the labs that should be included that are being kept out. Include just in the denominator. That is correct. Sorry, I had to cut. Do you mind? I have two more questions. So one, it seems to me that Texas Alliance is the hardest case for you. It seems to be at least closest. So tell me your best arguments for why that's different. Yes. So, Your Honor, I agree with you on that. And I think that what's important about that is both the textual argument that seems that was not made. And then also understanding the footnote nine, which is essential to that decision. So one of the things that we are focusing on here is, you know, my three points. One is that there's a textual argument that we're in. Second is the constitutional principle that it's primary conduct, which distinguishes most of the cases. And then finally, that it's not inextricably intertwined. When you take a look at the Texas Alliance footnote nine, it makes the important distinction that this is not just an amount determination, but it's much broader than that. So they interpret the statutory provisions relating to the process of awarding a contract and those other provisions that are different from the establishment of payment amounts as somehow being broader. And then when you look at the court's decision, it really doesn't engage in a textual analysis to suggest that Congress had created textual signals here, the different acts, the different language, the fact that there's actually concrete standards to apply. And instead, the court says, look, this all falls within the scope of that broad language, particularly because it's not just an amount determination. It's much more than that. And so, Your Honor, once we get past that, I think you're absolutely right that the other cases show, in every one of these cases, text is so important. In all of these cases, there is either no textual argument or the textual argument is so weak that the court dispenses with it very quickly. So, for example, in Mercy Hospitals, they try to argue that the alternative rates are not within the statutory definition. The court puts it out that the words are right there, and there's no argument other than trying to make general principles. What we've got here, though, is a clear indication that Congress actually, in the statute, distinguished between these two different things. And the arguments that the government raises about under the statute or the heading, Your Honor, you asked the question, just shows that there's two acts. None of those are the types of clear and convincing evidence that this court has required. So, on the text, we have to prevail. And then what we would say is all those cases can also be distinguished by the fact that you would expect Congress to anticipate judicial review here for two reasons. One, there's a concrete standard that is being applied. So, as in mining, the Supreme Court says, we don't just throw up your hands. We can actually hold you to the directive and expect Congress would anticipate judicial review. And, second, it's a regulation of primary conduct, where we expect agencies are exercising what we think of as legislative power there to define what the rules should be, not something like under the APA, an internal procedure or an interpretive rule, which is very similar to the establishment of payment amounts. That regulates secondary conduct. You trotted out or made noises about a constitutional argument in your brief, but I wasn't clear what the constitutional argument is. Is it due process? Do you call it separation of powers? Or can you just explain to me what it is? Yes, Your Honor. So, it's a constitutional argument in the sense of interpreting away from constitutional doubt. But we think that when an agency is asked to exercise legislative rulemaking power, in this case required to go through the notice and comment process and promulgate a rule, where it's filling in the gaps that direct parties and coerce them to do something they otherwise wouldn't do, it is regulating primary conduct. And those are the situations where private rights are at stake and where the separation of powers and the delegation concerns are at their greatest. I'm not suggesting to you that Congress in those circumstances. I didn't see cases. I wasn't clear. I mean, before we have, it has to be a serious constitutional doubt, and that would normally require some citation of precedent or cases that would show that it's constitutionally troublesome to go through notice and comment and yet not have that be subject to judicial review. And I just still am not quite getting it. Well, what I would say, Your Honor, is that in the other cases that you've looked at, like Florida Health, it is clear that that's all secondary conduct. It's all something connected to the establishment of rates. And it's not surprising there that I think the way the court is looking at that is to say, well, that's all one thing. Congress intended that to be precluded. What we have here is something different. We have Congress taking the extraordinary act of directing the agency to go out and take very private confidential information that otherwise would not be collected, analyzed in this way, and requiring laboratories, any laboratory that has a majority of its revenues on these schedules, Medicare revenues on the schedules, to start recording this data. That is a type of to give. Congress passed a law that said that. What constitutional provision would require that there be judicial review? Nothing, Your Honor. What I would say, though, is that Congress, it just goes to the point of speaking clearly, that in light, this court in Florida Health and other cases, says we need to look at the nature of the decision or the action that is taking place and then look at the nature of the bar. All I'm suggesting, Your Honor, is that it's not surprising that Congress treated these as separate acts, required one with notice and comment rulemaking, and didn't expect the one to be free from judicial review because it recognized the nature of the act that the agency was doing was different in kind, not just degree, than what we see in Florida Health. Your argument isn't, just to make sure you're clear, you're not making the argument that whenever Congress requires notice and comment, that it can't also preclude judicial review. No, Your Honor. But what I do think it's another way. Is there examples where it does? Well, Your Honor, there's oftentimes that that's the case, but it speaks clearly. Here, Congress could speak very clearly by in its saying, not only establishment of payments amount, it said all the acts under this section or the establishment of the parameters of data collection are also precluded. Instead, it was very clear that in the first case, we're going to have all these extra procedures. We're going to protect the confidential information. We're going to require a separate act, and we're going to require notice and comment rulemaking. We're not just making an option, but we're going to require it. And then in the second part, they say, now, once you've done all of that and you get this data, go ahead and establish payment amounts. And B, C, and D, word after word, talks about determining or establishing the payment amounts. And our submission is that it is reasonably acceptable to an interpretation that Congress saw those two things as different. And if it's reasonably acceptable, then we have to win. There's no difference, in your view, in the statute between payment rates and payment amounts, right? Not that we're making any point on it, no, Your Honor. But there's a difference between data process and data collected? The data you collect and the process you use to collect it? Well, Your Honor, I do think there's a difference in the sense of this. In Florida Health, it's all about the choice of the data, which is something that the agency does entirely within its discretion. We're not really challenging the choice of data. What we're challenging is the final rule that redefines the definition of applicable laboratory. That results in who is subject to the regulation that must process. Process for getting the data. And analyze it and do all those things. And then, eventually, the data gets to you. Well, you're not challenging how they analyze it. You're just challenging the net that they throw. Your Honor, you're absolutely right. If you take a look at Section B-2, when it talks about arraying data, that would be a Florida Health situation. So under Section B, it says, after you get the data, the agency must array it, and then it must establish the payment amounts. If we were to come in here and say, look, Congress did not intend to eliminate judicial review of the arraying of data, we would say in that circumstance, no, that's Florida Health. The arraying of data is caught up with the establishment. But that's very different from the separate act that requires a lot more process to occur before you get to the point that the agency has the data. Thank you very much. I'll give you some time back for it. Thank you, Your Honor. Good morning. Good morning. May it please the Court. Dennis Vann on behalf of the United States. There's only one way to establish payment amounts under the new PAMA system. The Secretary determines who to collect data from, when to collect data, what data to collect, and then he points to the middle data point. That is the rate of underpayment. How to protect the data? Sorry? How to protect the confidentiality of the data. That's part of the process too, correct? That is a statutory requirement that the Secretary. So that's part of the process. I mean, you left that out when you talked about it. The Secretary does have to protect the confidentiality of the data. That's part of the process of collecting it. It has to be. Or holding it, I guess, once you collect it. I mean, I don't know if it's necessarily part of establishing payment rates that it's part of the confidentiality. But certainly, going through Section A, once they do collect the data, of course, they have to hold it confidential under Section 10. Suppose the Secretary said, we're going through, did everything they did here, going through the process, and we've decided to contract out the, we know we have to keep the information confidential, we've hired a contractor to secure this information for us, and it's WikiLeaks. Can somebody sue and say that's arbitrary, capricious, totally irrational process for collecting this information because you're not keeping it confidential? So you certainly would not get an arbitrary and capricious lawsuit about the process for collecting data. Is that covered? And how it goes into – Would that challenge be covered by the jurisdictions-driven provision addition here? And certainly, if there's an instance where the Secretary doesn't at all follow the statute and says, you know, we're – So let me keep the question the one that I asked. They've hired someone who seems quite an unreasonable choice of a contractor to be in charge of protecting the confidentiality of this information, WikiLeaks. Right, and so they would have to – And so someone says, a lab that is covered by applicable lab here, but understandably doesn't want to turn over its information, can they sue and say your collection process is arbitrary, capricious, unreasonable? It's a general APA lawsuit. I mean – Can they sue or is jurisdiction stripped under this jurisdiction provision? I think jurisdiction is certainly stripped of what we have here, and – I'm not asking what we have here. I'm asking my hypothetical. Is jurisdiction stripped? And I think if they could show that something was completely outside the bounds of the statute – Is that completely outside the bounds of the – I'm asking – I'm just asking you to answer the question. Is the lawsuit that I hypothesized in or out of the jurisdiction stripping provision? I can't hypothesize that sort of lawsuit because it – Of course you can hypothesize a lawsuit where they are irresponsible. I mean, they have something. It's a fig leaf of confidentiality, but it's strongly felt to be irresponsible by the clinical labs. Well, if they said, like, you know, confidentiality is putting it out on, like, the front lawn of the courthouse, that wouldn't be confidential. I'm not giving you that. That's too easy. That's your ultravirus. That's not confidential. I'm giving you a hypothetical that involves an arguably unreasonable decision by the secretary as part of the data collection process. In that sort of argument, I'm sure if what they were trying to challenge was that they said, because of your, you know, incorrect confidentiality provision, what we're trying to do is to take down the payment rates. We want our old payment rates back. No. We want new payment rates in existence. No. No. No. No. No. No. I'm not making that. I'm saying, can they challenge? Maybe I'm not being clear. Am I being clear on the question? No, no. I completely understand the hypothetical. You know, I obviously can't find the agency of what arguments we would make in a hypothetical case. Well, I'm asking you what your jurisdiction stripping provision means as it applies to the data collection process here. We think that the jurisdiction stripping provision applies to everything that falls within its plain terms, which are the establishment of payment rates. So to take a related hypothetical, if a lab is assessed a fine for failing to comply, and it wants to challenge, it says, actually, we're not an applicable lab. You're wrong. Under your own definition, you're just wrong. Does it have a claim, or is jurisdiction stripped from that? So, you know, I'm also happy to answer that hypothetical, but I do also want to point out a few things before that. The complaint here is that the Secretary's definition is too narrow. So in the case that we have here, if the complaint was that we're going to be assessed fines under the Secretary's definition but not under the statute, that certainly wouldn't go through the fine process, right? It wouldn't be a claim that could possibly exist. So you'd have to find some sort of claim that the Secretary's definition was overbroad. Well, I mean, you could make a mistake. You could have the definition you have, and anyone can make a mistake and reach out to the wrong lab. So we don't actually. So I just wonder whether that kind of thing is also stripped as far as your logic of your position. And then the other part of that is there's no threat of penalties here. And so I want to point that out. In this case, there is under the statute. There is under the statute. HSS has never threatened penalties against any laboratory so far. But, you know, to get to your hypothetical, even assuming there's issues in the penalty proceeding, even assuming in the penalty proceeding there'd be some serious concerns about, you know, what the scope of judicial review were, we think that'd be a very different type of remedy that they'd be getting in that type of case. In that type of case, you'd be getting yourself. You'd most likely be getting a vacater of the penalty, right? So you wouldn't have the penalty assessed against you. Speaking of remedies, perhaps more relevant is I was not entirely clear about the nature of the remedies were basically to prevail on its challenge. And Mr. Parrish was saying that it's a very individualized process and making it sound like all bets would be off. Am I right that either it's the PAMA rates that are established by the Secretary, or if those are invalidated, it would have to be whatever the pre-PAMA process was? Or is there some middle ground? There is no middle ground, which I think only highlights why Congress thought that the judicial review preclusion was so important, that they got rid of a 30-year process for clinical laboratory fees and replaced it with a new process. And if every three years a new litigant could come into court and challenge that new process, well, PAMA may well never go into effect. And so if you look on page 38 of their- If someone were challenging the confidentiality treatment of information, that would not be inextricably intertwined with the rates. It could have some connection, but that would not be inextricably intertwined. It may well not be, and this Court would have to- How would it be inextricably intertwined? First go look at the plain language of the statute, as we're doing here, and then look at whether it's inextricably intertwined. And to go to that point- So what plain language of the statute says that the confidentiality treatment might not be subject to jurisdiction stripping, but the rest would? So H-1 doesn't- I mean, this is part of H-1, but H-1 doesn't go through and say, well, this subsection is, this subsection is not. H-1 is a broad provision. It has its own type of language. It talks about implementation, which we think can only mean the implementation of the payment system. Right. I'm sorry. I thought you just said we'd have to do a textual analysis to figure out whether a challenge to confidentiality process would be in or out of the jurisdiction stripping provision. But I'm trying to ask if there's any jurisdictional, any textual difference. It's part of this section, probably part of- might well be part of implementation under your theory. It's part of how they get the information to establish the rights. So is there some textual addition that I'm missing? About why confidentiality is inextricably intertwined with the establishment of payment rights? I mean, confidentiality, there's a possibility. I mean, we're not making this argument here, but of course there's some possibility that because you assure confidentiality, people are more willing to share data. And that would be the reason why it might be inextricably intertwined. But of course, like, we haven't had a challenge to the confidentiality provision. We haven't had a challenge to, you know, the civil money penalty provision. So if we go back to page- Well, I understand. But if we decide, if we interpret, you know, you're asking us to adopt an interpretation of statutory text that gets you into the jurisdiction stripping provision. And it's our job to be careful when we do that. We have presumptions against doing so. And we have to think carefully about what your statutory construction arguments mean. And I'm trying to find, you're now trying to claim some wiggle room, or let's put confidentiality aside and not decide it today. You seem to be suggesting we don't have to decide that today. I'm trying to figure out on what basis with any intellectual integrity we could write that in an opinion. So I think the basis is fairly straightforward. And the basis is the logic of Florida Health, the logic of Mercy Hospital. In Mercy Hospital, this court said that realistically, when a court cannot review one agency action without reviewing the other agency action, then that is an instance where, you know, this is all inextricably intertwined and where a preclusion of review happens. So confidentiality would not be part of the data collection process. And the court could reserve that question and say we don't know, and there might be an instance where confidentiality isn't part of the data collection process. You might imagine an instance where Congress abandons a whole new system, you know, PAMA 2.0, and we still don't keep the PAMA data private. It wouldn't have anything to do with the payment rate at that point, because at that point there's a whole new payment system. Parts of the process here are not in data collection process, are not inextricably intertwined with rates. There's that. I mean, it sounds to me like you're saying, certainly your position is some parts are, and you would say what they want to do today is inextricably intertwined. But there are other parts of this data collection process that at least might not be inextricably intertwined. We're perfectly happy the court reserves that question. But the process is not inextricably intertwined. You're not asking us to hold that today. No, we're definitely not. But, like, if you want to, you know, if the court wants to kind of think about the confidentiality provision and think about it separately. Well, do you think we should, or do you think we should sweep the confidentiality? I mean, do you think it's a good idea to set it aside or not? What do you think? Whether it's a good idea. No, I don't think it's a good idea to set the confidentiality provision aside. Oh, so we should. You think the better idea is to say that those challenges are also swept up in the jurisdiction supervision. No, I think the better idea would be to think about the remedy, think about the relief, think about the claims that the plaintiff here is bringing. And if we go to page 38 and 39 of the joint appendix, which are their claims and their requests for relief, they're requesting to have the old payment. Well, we're not construing a complaint. We're construing a statute. Sorry? We're not construing a complaint. We're construing a statute. Well, we're construing whether their claim falls within H1. And if their claim falls within H1, I mean, H1 obviously doesn't. Within the statute. You're saying within the entire. Sorry, I'm using the U.S. code, so M1 is, right? Right. Within M1 subsection H1. Sorry, I'm being a little bit shorthand here. Okay. Sorry. All right. Great. Yes. I get that. So if we think that their claim falls within either the plain language. But how do we think that? I thought we were supposed to think that by construing the statute. Yeah, we definitely are. And under the statute, there is only one way to establish payment rates under an H1. You all had the argument about established under the section. Section means section. And that A is all about getting payments and stuff for. This is all that they want to do. The A and B is different. A, you say, is getting the data that we then use. And B in Congress wouldn't have wanted to separate them out. That's why I said established under this section, not this subsection. Right? That's your textual argument. Yeah. I mean, we have various textual cues. I think the principal language, established payment rates, is the principal text that we're looking at. And to define who wants to collect data is certainly part of the establishment of payment rates. This Court might find that other provisions are not part of the establishment of payment rates. But Congress intentionally used broad language, we think, because it didn't want it to be up different subsections. The secretary for collecting this data has set a time period, right, that they have a reporting period that the data has its own period, but they have three months to report it. Is that right? I think it depends. The secretary can set a different time period. So for 2021 to 2023 payment rates it might be a different period. There might be a different numerical threshold. But right now it's three months? I think that's correct. It might be six. I think it's three months. Yeah, it is three months right now. Yes, that's right. They said the secretary set a time limit because I assume it takes a lot of work to get those data together. On the part of the secretary? No, no, no, on the part of the laboratories. It can. I mean, we acknowledge that the initial period may have been more difficult on laboratories than subsequent periods. Once you know what you're doing and how you're sorting your data and how you're looking back on your data, I think this becomes substantially easier. What if the secretary said the reporting period is one week? And that meant, and there were plenty of comments on it, that virtually all the labs are going to have to shut down. There's no way they could do it within that one-week period without shutting down their business and putting all hands on deck for data collection. And we think that is definitely under H1. We think that that's a choice the secretary makes. That might result in worse data, and so the secretary might not want to do that, but we think that still necessarily would fall certainly under H1. But the secretary could force his businesses to shut down to provide it with non-Medicare information, and that is within the bar on judicial review. Sorry, if the secretary went ahead with some agency action that said you have to shut down your business, of course that's, I think that's a different instance. No, but if it adopted a time period where everyone knew, and it's notice and comment. Everyone's told the secretary, don't do a five-day time period. We will, there's no way we can comply unless we shut down our businesses, and the secretary says five days it is. So perhaps there's also a little bit of, there's a data collection period, so that's a period in which you collect data. No, but that's a period that the data covers. That stays the same. I'm talking about the time that the companies have to package it all together and report it to the secretary. That were what the secretary did knowing it was going to cause enormous financial harm to these businesses. And to medical care.  I don't want to fight the hypothetical, but, again, we think that the secretary here has wide discretion about what data. And that's within the jurisdiction stripping provision. Sorry, I just wanted to follow up. So that's within. We think it would be within the jurisdiction stripping provision. Even though five days isn't really inextricably tied to the rates, it will have an indirect, that size of that period will have an indirect impact. But this is just a pure challenge to process. Yeah, we think that when the secretary gets the data, when that data is being used, that process for having the secretary set up the payment system, I think that all falls comfortably within the establishment of payment rates. The secretary can think that, like, they need the data sooner rather than later. That equally falls within the establishment of payment rates. When statutory text is reasonably susceptible of divergent interpretations, we're supposed to read it so as not to foreclose judicial review. And there are statutes that specifically refer to collection of data and establishment of crisis statutes that your agency administers. There are statutes that refer to stripping APA review as well as review under the statute itself. Here we don't have those. Is APA review available? For example, if there were a notice and comment violation or the final rule was not a logical outgrowth of the proposed rule, are those kinds of challenges still permitted? So I think logical outgrowth is not. There are certain provisions within APAMA that require us to go through notice and comment. And I think we think if we just said, no, we're not going to go through notice and comment, you know, perhaps somebody could raise an ultra-various claim there that we simply did not do so. I understand that whatever the Secretary does, it's not going to be perfect in terms of getting all the data from all the applicable labs. What's your pushback on the ultra-various argument? I know you briefed it, but it seems to me like the line that ACLA is drawing is basically anything that's unlawful is also ultra-various. And your position is it's not unlawful, but what, in your view, does the ultra-various doctrine do that's separate work from the statute? In general, I mean, this Court has said you need to find a patent violation of the statute. And I realize I'm going over my time, and so I'm happy to answer this. And that is something that we certainly do not have here. So I think if you go to page 620 of the record, even plaintiff here says it may be less obvious when a hospital laboratory derives a majority of its Medicare revenues from hospital reimbursement sources. And so in those types of instances, we think that this is essentially just a repackaged type of garden-variety, arbitrary and capricious type of claim. But, you know, it's sort of purely hypothetical. When is agency action simply contrary to statute versus, you know, patently a violation of the statute? I think if the statute itself is not clear about how to do something, the statute here doesn't define laboratory even. So if the response to every comment were, I don't care, so they went through notice and comment, and there was a response to every comment, and it was, I don't care. Well, certainly that is not what has happened here. There's a reason I'm asking the question. Is that ultra-virus or not? There may be requirements about how thoroughly we need to respond to comments. Of course there's requirements, but that's what jurisdiction has been stripped over. There's only a façade of having done notice and comment. I think that would be a very tougher claim. Would that be a façade of having done notice and comment? It's a tougher claim. All I'm asking is whether that's ultra-virus or not, or is that not covered by jurisdiction stripping? You can pick either pocket. I think we would have to look at what the Secretary had done in that particular letter. I told you what the Secretary did. I told you what the Secretary did. I don't care. Right. If we had just put out a notice out into the world and had gotten comments, but hadn't actually even responded to the comments. No, no, no, no, no. Responded. Right. Responded. I'm using shorthand in that sense of not having responded in a real way to comments at all. Well, is I don't care a real response? It can be in certain instances if the comments are particularly bad, but I think that's why you would want to have to look at the record in that particular case. At least the record here, we think this comfortably falls within the establishment. I just have one more question. It's an easy one for you. Just in terms of context, indulge me. Why wouldn't Congress have just said all labs that are Medicare participants, please provide us your market-based lab services fee schedules? I really don't know why Congress didn't do that. It certainly didn't do that here. We know from a few textual cues that Congress was attempting to approximate market-based rates. It wasn't attempting to get exact market-based rates. For example, these rates only update every three years, so they're going to be inaccurate at some point. There's the low expenditure threshold, so you cut out a lot of market participants. Just in terms of administrability, which is where a lot of the complaints are coming, and cost of getting the data, it just, I mean, as a generalist, it just would be helpful if I had some better appreciation of what this is all about. No, and I completely agree. Congress certainly could have defined laboratory. It could have defined sort of how you go look at the total Medicare revenues, just because that only goes to show that the Secretary was enacting those sorts of, was kind of clarifying those sorts of provisions and doing what he was doing in this particular instance, because Congress was not clear about those particular issues, and I think all of those actions fall within the establishment period. So we urge you to occur. I'm sorry. Yes, of course. Sorry. So this new rule has been adopted, and I assume that's covering even, is that covering, I take it there's a data collection period right now for reporting next year. Is that covered by the new definition? Yes. Sorry, the new rule, okay. So there is the old definition that in 2016 will not be like, It's a one-time. It will not be used in the future, right? And so in that sense, what you have is the new definition is going to go into place, which only, I think, shows that this particular case, the only relief that they will get is if they can change the Medicare payment rates, and that has to fall within. What I'm trying to understand is, so your point seems to seek injunctive and declaratory relief, but you haven't made a mootness argument, and that is because I take it you agree that if this court made a ruling, I mean, I'm sure at this point it's just jurisdiction, but somehow hypothetically some court got to the point that said your definition was wrong. You don't dispute that there's any statutory bar to it then being applied, I guess, by the provider reimbursement review board, or I'm not sure what the process would be for. Yeah, I'm not even sure what the process would be of, like, reestablishing new payment rates, because there really aren't any. They've already been paid, haven't they? Sorry? I mean, they've already been paid for a lot of this past year. They have been paid. They'll continue to get paid until 2021 under the new PAMA rates. But, you know, I want to underscore, a court vacates the new PAMA rates. Congress has put in a sunset provision on the old clinical laboratory fee schedule under 1395L, A1D, and 2D. And so it's not clear that there is anything to pay laboratories with at that point. We'd have to invent payment rates basically out of whole cloth. I'm just trying to figure out why the government hasn't made any sort of mootness argument or any argument that there's a barrier to providing the relief they currently seek. I think we said that the only remaining basis for standing, which we think is their only basis for standing, is that the payment rates are incorrect. And that's not moot because they want the payment rates changed. And this sunset provision wouldn't change. That's what I'm trying to be clear about. There's a certain number of years that payments have already been made under the rates that they don't like. And you don't have any, you agree that if, hypothetically, you don't think it should happen, the court were to hold that the payment rate was wrong because the collection was wrong. Right. Whether we'd have the obligation to fix the old payments. You'd have the capacity to fix the old payments because you can't go back and do a new collection. We'd first have to reinvent new payment rates that aren't the new payment rates. And then we'd have to. Are you allowed to do that under the statute? I don't think we have this statutory authority necessarily to do that. I mean, obviously the court were to. Well, I'm just curious. If you can't do it, you would have told us that there's a new rule that's in place, and there's nothing we can do to remedy the old one. But I hadn't heard that from your briefing. It might be really hard, complicated. It might be almost impossible. It might be an extremely, I don't even want to. It might be an extremely far-fetched type of relief for a district court to give. We might even think that it contradicts the plain text of the statute in other ways, and that would be all the more reason why. But you're not making a mootness argument now. They can still hypothetically, in a hypothetical world, change their payment rates, at least between now and 2021, when the second tier of PAMA payment rates go into effect. Great, thanks. Thank you very much. Thank you. Your Honors, what I'd like to do is three points. First, Judge Millett, just highlight your question about the confidential data. Second, Judge Pillard and Judge Millett, address your point about the remedy here, because I didn't mean to make it as complicated as it might seem. And third, address the ultra-various point very quickly. So they have no answer to the confidential data point, and I'd urge your court to look at the mock mining case, because what's key about these cases is that the court looks not just at the scope of the jurisdictional bar, but also as to whether there is any concrete standard that the court can apply. What is going on in the Florida Health case is the only standard is whether it's an appropriate estimate, and the court has to throw up its hands and say, well, can this be separated out? In this case, in subsection A, in all of these provisions, we have concrete standards that can be applied that Congress, under mock mining, the Supreme Court would say intended the judiciary to enforce, which is very different than the secondary conduct of trying to establish payment amounts, which has to do with arraying data. Those two things are separated in the statute. You can separate them, and then, Judge Pillard, you are correct. There is a reasonably acceptable interpretation. It, therefore, has to be in our favor. On the remedy question, Your Honor, let me put it this way. If the agency had said in response to Congress's directives, we don't care that Congress wants market data. We are going to collect data however we want, but then what we're going to do is we are going to just go ahead and throw out 20% of the best data there, the highest payment rates, so that we can ensure that when the data gets pushed into the establishment of payment amounts, we will have only collected data that will ensure that it's suppressed. You would say at that point that it was ultra viris, and what you would do is you would strike it down, and you would let the agency use the administrative processes for fixing it. All we're asking for from a remedy from this Court is to find that the final rule is unlawful and to vacate it. We think that the result of that is that the rates are ultra viris, and then the agency can fix that through the administrative process it uses all the time, which is why, Judge Millett, that argument was not raised in the briefs. If it had been, they would have raised mootness. They didn't. It was the dog that never barked. And then lastly, on the ultra viris question, all I would say, Your Honors, we're not trying to argue that anything unlawful comes within the scope. What we're saying is that City of Arlington and the SAS case urge you to look at both of those. Get rid of the idea that there is a heightened jurisdictional bar. So what we are looking at is, is it a violation of an unambiguous statutory directive? It is clear here that Congress defined applicable laboratory in A2. It said the revenues of the laboratory, its revenues, and compare its revenues to those two fee schedules. The only reason it did that is because it knew that hospital labs also had revenues from other Medicare schedules. That's the reason why it was defined that way. The fact that the secretary comes along to exclude hospital labs is a complete thwarting of the whole point of the statute. I'm sure your clients were involved in the legislative process. Do you have any idea why they didn't just say any laboratory that gets reimbursements from Medicare, give us your market-based fee schedule? Because there are some hospital laboratories out there that do not provide outreach services. What they are doing is largely... We don't do outreach services. We don't want your prices. We only want your outreach services prices. Which is why every lab gets swept in as long as a majority of its Medicare revenues. So even if it does mostly private services but occasionally does a Medicare service, it has to report the data because they want to know for those labs that have a majority of their Medicare revenues from these two particular schedules. So what they are looking at, Judge Pillar, and you put your finger right on it, is they want to get all of the independent labs, all the physician labs, all the specialty labs, and all the hospital outreach labs. To the extent the hospital outreach labs are doing outreach services. Exactly. And the only way you can do that is compare the revenue of the outreach services for the revenue of the non-outreach services. Is that the only way? Why can't... I mean, I assume they just have prices that they charge outward looking as distinct from bundled, whatever the complicated metric is that they use for hospital in and out patients. It's just an accounting mechanism for the hospital. And the point is we know they can do it because in the new 2018 rule they've done it. We know that we've submitted comments that say you can do it. And the agency just threw up its hand and said we're going to carve off all the hospital labs. It is so clear. Did you ask in comments originally for the, whatever it is, the 14X denominator that they're now using going forward? Your Honor, I know that we have proposed a version of 14X that refers to 14X. I don't know... Back in the beginning. In the beginning we proposed a bunch of things. 14X was one of those. I'm not sure it's entirely the same variant that we're seeing now. But the concept was something that we proposed to them. And you can imagine it would not be difficult for the Secretary to just say figure out any way you want. And let me just finish with this point. This is an extraordinary violation of the statute. We have hospital labs that are 25% of the market for these schedules, only less than 1% reported. We have 7,000 hospital labs that provide outreach services, at least 3,500 of those which are significant outreach services, only 21 reported. And that 21 is both over and under inclusive because it only depended on whether it has a billing number. It had nothing to do with the amount of their actual revenues. And we even have in certain states a big complaint was in the record about Utah because there's one hospital that provides 60% of the outreach services there and it didn't have to report. This is completely undercutting what Congress intended. This is precisely the situation where Congress envisioned that there would be judicial review to require compliance with specific concrete directives, and with that we'd ask that Your Honors reverse and vacate the final rule. Thank you. Thank you very much. The case is submitted.
judges: Griffith, Millett, Pillard